BLANCHE, Judge.
Plaintiffs, the owners of a tract of land located in West Feliciana Parish comprising the east bank of the Mississippi River known as Fancy Point Plantation, pursuant to legislative authorization brought this suit against defendant seeking to be declared the owners of a certain island located in the Mississippi River and immediately to the west of plaintiffs’ riparian estate, known as Fancy Point Towhead.[1] At the conclusion of the trial the case was taken under advisement and in due course judgment was rendered in favor of defendant and against plaintiffs declaring defendant to be the owner of Fancy Point Towhead. From this judgment plaintiffs have appealed. We reverse.
Resolution of this title dispute depends upon whether the factual situation in the instant case warrants application of the rule enunciated in Louisiana Civil Code Article 512 or Article 517. Civil Code Article 512 provides that:
“Islands and sand bars, which are formed in the beds of navigable rivers or streams, and which are not attached to the bank, belong to the State, if there be no adverse title or prescription.”
Conversely, Civil Code Article 517 provides the following:
“If a river or stream, whether navigable or not, by opening itself a new branch cuts off and surrounds the field of any individual owner of the shore, and makes it an island, the owner shall keep the property of his field.”
Accordingly, if the island in question— Fancy Point Towhead — constitutes one formed in the bed of the Mississippi River and which was not attached to the bank, it would belong to the State, pretermitting any question of adverse title or prescrip *890 tion, whereas if the island constituted a part of the existing land which is divided from the adjacent land by a river’s opening a new branch thus forming an island, the island remains the property of the riparian landowner. Although the trial court gave no separate reasons for judgment, it is evident from the judgment rendered, read and signed, as amended, that the trial court specifically concluded that Fancy Point Towhead was formed in the bed of the Mississippi River not connected or attached to the eastern bank, thus making applicable Civil Code Article 512 instead of Article 517[2]
Defendant’s contention that Fancy Point Towhead constitutes an island that was formed within the Mississippi River itself from the bed thereof and completely separated from either riparian bank is supported primarily by the expert testimony of Walter C. Cary, whose opinion as to the genesis of Fancy Point Towhead is summarized as follows:
“Fancy Point Island was formed as a result of the accretionary processes on the east side or left bank of the river and which had been proceeding for many years, consisting of the gradual growth outwardly and somewhat downstream over the years. And finally at sometime slightly before 1883, due to the exceptional caving in what we call Grand Bay on the opposite side of the river, which I’ve shown, widened the river by almost a hundred percent. The operation was then superseded by another, which is a common phenomenon on the river. The river — the building processes on the left bank could not keep up with the caving processes on the right bank, and the river, in effect, skips some water area and built — or commenced to build an island, which appeared as a middle ground sometime slightly prior to 1883. And that is the complete story of Fancy Point Island.” (Record, p. 557)
This expert opinion was reiterated by defendant’s other expert witness, Hatley Harrison, Jr.
Plaintiffs offered in support of their contention that Fancy Point Towhead was formed by the Mississippi River opening itself a new branch and cutting off part of their land, thus making applicable Civil Code Article 517, the expert testimony of Austin B. Smith. His opinion as to the genesis of Fancy Point Towhead is summarized as follows:
“Well, I feel that the evidence is irrefutable with reference to — the 1883 survey, the 1894 — ’95, and the 1909 surveys provide irrefutable evidence as to the manner in which the so-called Fancy Point Towhead was formed. In 1883, as is shown by Chart 143, I believe, there was a massive point bar at the distal end of Fancy Point. This massive point bar extended for three miles around the west and south ends of the Fancy Point, and it extended out into the river some 1,500 to 2,000 feet at this time, and this was the condition obtained in 1883. The next map we have that gives evidence of the bar was 1895. 1895 shows a — the point bar with supporting willows, with a swale area adjacent to the bank, with ponded water in the swale area. So what we have in the 1895 map is an accretion area with what we call a series of ridges and swales. So we have a ridge and a swale or a swale and a ridge. And this is common to any accretion area. And between 1895, the — beginning after 1895, and at the time of the 1909 survey, the river scoured a chute channel adjacent to the east bank of Fancy Point — that is, it would be the *891 west bank of Fancy Point but the east bank of the river, that is, the east top bank, — and formed what is called the Fancy Point Chute. Now, this wasn’t an absence of action of the river; this was an action of the river. So — but the lands that were on Fancy Point had their genesis — I mean on Fancy Point Towhead had their genesis as accretions to Fancy Point.” (Record, pp. 198, 199)
The first significant documentary evidence pertaining to the genesis of Fancy Point Towhead is an 1883 Hydrographic and Topographic Survey of the Mississippi River made under the direction of the Mississippi River Commission, the area in question being depicted on Chart No. 143 thereof. (Plaintiff Exhibit No. 10; Defendant Exhibit No. 5) This hydrographic survey was taken at a time when the river was at a very high water stage, approximately 13.5 feet above the mean low water mark in the area in question. Accordingly, the land area in question was admittedly inundated, thereby necessitating resort to interpretation of the water depth soundings and contouring thereof in order to arrive at any conclusions concerning the existing topography. Mr. Smith testified that the depth soundings when contoured reflected topography consisting of a peninsula and that the area presently included in Fancy Point Towhead constituted successive layers of accretion adjoining the eastern bank of the river comprised of alternate ridges and swales. He specifically interpreted this hydrographic survey as confirming the nonexistence of an island lying west of Fancy Point Plantation.
Conversely, Mr. Cary interpreted this hydrographic survey on the basis of his contouring thereof as reflecting the existence of an island formation completely separated from the eastern bank by the Mississippi River.
H. M. Hayne, employed by the State and evidently requested to interpret this hydro-graphic survey on behalf of defendant, opined that the depth soundings could be contoured so as to reflect either an island or a peninsula, but in his opinion the topographic feature in question was more probably a peninsula. The pertinent part of his testimony in this regard is the following:
“A * * * Now, in my figuring on it, there were two ways to figure contour on it. You could make an island out of it, or you could make a peninsula out of it with a body of water behind the island and the land. Now, you had no connection. There’s no way to tell whether — between the two contours you still had water in between them, and then— now taking further out in the river the contours in as showing a depth outside of the island, between the island and the west bank, that it looks more logical to me that the thing was a peninsula and not an island. In other words, your zero would go down, cut out and go on the west side of the island, come back between the island and the mainland, and cut to the mainland and then follow down the mainland leaving more or less of a slough in the back between the south end of the island and the mainland.
“Q Now, you are telling us this is your opinion, or that this is one way that it could have happened ?
“A Well, that’s one way it could have happened — not how it actually happened — but in my opinion the most logical way to run your line around would be to leave a slough back of the island and not a straight chute all the way down the bank and make an island out of it. In other words, make a peninsula out of it.
“Q Your opinion is that in all probability it was a peninsula ?
“A In all probability it formed as a peninsula.” (Record, pp. 294, 295)
The next significant documentary evidence concerning the genesis of Fancy *892 Point Towhead is the chart of the area in question prepared in 1895 as part of the Mississippi River Low Water Survey, Vicksburg to Donaldsonville (Plaintiff Exhibit No. 13). The unrefuted testimony of Mr. Smith concerning this chart shows that the area in question in 1895 according to the chart was depicted as a peninsula and not as an island, which peninsula was comprised of accreted area with alternate ridges and swales, certain of which swales contained ponded water bordered by growths of willow trees.
The third significant piece of documentary evidence is the 1909 Mississippi River Shoreline Survey by F. A. Walton (Plaintiff Exhibit No. 14) which depicts the area in question as an island lying west of the eastern bank of the Mississippi River. Mr. Smith testified in essence that by comparing the three aforementioned maps or charts, he concluded that the land area in question was comprised of accretion adjoining the eastern bank of the Mississippi River or the high land of Fancy Point Plantation which accreted area formed a peninsula at least until 1895, but that at some time between 1895 and 1909, the swale was scoured out by river action at high water resulting in the formation of a chute by 1909 and the consequent island known as Fancy Point Towhead. (Record, pp. 441-471) Specifically, Mr. Smith testified that there were heavy floods which occurred in 1903 and 1907 which could very well have produced the necessary river action to form the chute. (Record, p. 489) Mr. Smith explained how this would have occurred on the basis of his analysis of the river, conditions between 1895 and 1909 as follows:
“Q I see. Do you know of any physical cause for the formation of the chute between the years that I’ve just mentioned, between 1895 and 1909?
“A Well, I’ve analyzed the river conditions that are shown in 1895 and the river conditions as shown in 1881, and the axis of the bend within which this ['sic] point bar accretions were formed the — it was tight; the point bar had built out and the concave bank on the right had not receded as fast as the point bar accretions had filled out so you had a tight situation, and a condition which would, I would think, be conducive to over-bank scour at high stages, and this is my conclusion and I so stated in my report.” (Record, p. 140)
Mr. Smith specifically testified that he was able to correlate the chute area appearing in the 1909 survey with the area of ponded water lying in the swale as depicted in the 1895 low water survey. (Record, p. 209) In support of his opinion, Mr. Smith identified two other areas where a similar swale area as depicted in 1955 aerial photographs had been transformed into a chute with resulting islands as depicted in subsequent (1962) aerial photographs. (Record, pp. 215-217; Plaintiff Exhibit Nos. 20-23)
In further support of their contention, plaintiffs offered the testimony of Valcour E. Leet, who testified that when he was a young boy he remembered the area of Fancy Point as constituting a peninsula and not an island, over which area he could walk from Fancy Point Plantation to the river, which area, however, did contain a wide slough. This witness testified that before he left the area in 1907 there was not any water running through the slough, although there would be some ponds of water or water in the slough at high river stages. When the witness returned to the area in 1915, the slough was deeper and .had resulted in the formation of an island to the west of Fancy Point Plantation. (Record, pp. 255-268)
After carefully reviewing the extensive record in the instant case, we are satisfied that the trial court committed manifest error in holding that the land area in question was formed in the manner testified to *893 by Mr. Cary and in not declaring the land area as belonging to plaintiffs. While we are satisfied that both the alluvial, morphological process described by Mr. Cary, on the one hand, and the process described by Mr. Smith, on the other, can be encountered, nevertheless, we believe that the process described by Mr. Smith was, in fact, the process which occurred in view of the topographical situation depicted in the 1895 survey and surveyor’s notes, contrasted with the 1909 survey. Indeed, the island theory postulated by Mr. Cary on the basis of his interpretation and contouring of the 1883 hydrographic survey fails to explain why the island which he says existed in 1883 ceased to exist in 1895, only to reappear in 1909. Conversely, the expert opinion and explanation given by Mr. Smith is amply supported by the documentary evidence, the expert testimony of H. M. Hayne and the eye witness testimony of Valcour E. Leet.
Counsel for the State argues in his brief that the factual situation here presented does not support application of Civil Code Article 517 for the reason that the Mississippi River in the area in question has not opened itself a new branch in that the river has not changed course or altered its main direction of flow. This contention is without merit and appears to result from an unwarranted confounding of the provisions of Louisiana Civil Code Article 518 with those of Article 517. Article 518, contrary to Article 517, requires that the river open itself a new bed by leaving its former channel.[3] Article 517 does not envision such a change of channel or stream but instead provides a rule of accession merely where the river divides in such a fashion as to open a new branch resulting in a separation of riparian land. We are satisfied that the factual situation
encountered in the instant case specifically warrants application of the provisions of Article 517, thus entitling plaintiffs to be declared owners of the land previously constituting accretion attached to the bank now separated by a new branch of the river.
Defendant also contends that because the land area in question is called “Fancy Point Towhead,” the use of the appellation “Towhead” has generic significance inasmuch as the term would have been used allegedly by river boat pilots only to refer to an area of land formed from the bed of the river within the river and not contiguous and attached to either bank. This contention is likewise without merit for the reason that the evidence fails to support the conclusion that the term “Towhead” can properly be given any such alleged generic significance.
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered in favor of plaintiffs, Robert Ormond Butler, Patrick Lawrason Butler, Edward Murrell Butler, Thomas Butler Lawrason, Jr., Florence Lawrason Wright, Margaret B. Lawrason, Michael K. Fisher, Robert B. Fisher, Jr., Lawrence W. Fisher, Levering Lawrason, George C. Lawrason, Charles M. Butler, Mrs. Hattie Butler Bruns, Mrs. Alice Kilpatrick Fuller, Mrs. Ann Kilpatrick Harvard, Kathleen Patrick Kilpatrick, Karen Ann Kilpatrick, Caroline Conrad Heinlien and Fancy Point Corporation, in their respective interests and against defendant, State of Louisiana, recognizing plaintiffs as the owner of the property more particularly described as follows:
A certain island, commonly known as Fancy Point Towhead, located in the Mississippi River, adjacent to and south *894 west of Fancy Point Plantation, m West Feliciana Parish, Louisiana, opposite Grand Bay Revetment on the west or southwest, and situated, at present, about one mile and a half upstream from the mouth of Thompson Creek, at approximate mile 257 above the head of the passes, as shown on the New Roads, Louisiana Quadrangle, 1963 edition, prepared by the Mississippi River Commission and published by the United States Department of the Interior, Geological Survey.
Defendant is taxed with all costs of these proceedings as may legally be assessed against the State of Louisiana.
Reversed and rendered.

. The island or towhead is more particularly described as follows:
A certain island, commonly known as Fancy Point Towhead, located in the Mississippi River, adjacent to and southwest of Fancy Point Plantation, in West Feliciana Parish, Louisiana, opposite Grand Bay Revetment on the west or southwest, and situated, at present, about one mile and a half upstream from the mouth of Thompson
Oreek, at approximate mile 257 above the head of the passes, as shown on the New Roads, Louisiana Quadrangle, 1963 edition, prepared by the Mississippi River Commission and published by the United States Department of the Interior, Geological Survey.
The formation is depicted by aerial photography in Plaintiff Exhibit No. 19 (Record, p. 355).

. The judgment rendered by the trial court, as amended, contains the following clause:
“Said island or towhead having been formed within the confines of the Mississippi River itself, on a portion of the bed thereof, physically separated from both banks of said river and from any accretions to the left or east bank of the river. (Judgment, as amended, Record, p. 79)

. Louisiana Civil Code Article 518 reads as follows:
“If a river or stream, whether navigable or not, opens itself a new bed by leaving its former channel, the owners of the soil newly occupied shall take, by way of indemnification, the former bed of the river, every one in proportion to the quantity of land he has lost.
“They shall again take their former property, if the river or stream returns to its former channel.”